UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LIVELIFE, LLC,<br><br>                            APPELLANT,<br><br>    v.<br><br>BAY POINT CAPITAL PARTNERS, LP; and SHELLEY D. KROHN, CHAPTER 7 TRUSTEE FOR THE ESTATE OF ARRON AUGUSTIN AFFLALO,<br><br>                            RESPONDENTS. | Case No. 2:21-cv-02106-ART (Appeal Reference No. 21-30)<br><br>Bankruptcy Case No. BK-S-19-12086-ABL<br>Chapter 7<br><br>Adv. Proceeding No. 19-01084<br><br>                        ORDER |

## I.  SUMMARY

Before the Court is an appeal by Appellant LiveLife, LLC ("LiveLife") of the following orders ("Orders") entered by the Bankruptcy Court on November 10, 2021: 1) Order Denying Motion for Partial Summary Judgment Filed by LiveLife, LLC [ECF No. 361][1]; 2) Order Granting Motion for Summary Judgment Filed by Counterclaimant, Third-party Defendant, and Chapter 7 Trustee Shelley D. Krohn [ECF No. 362]; 3) Order Granting Motion for Summary Judgment Filed by Bay Point Capital Partners, LP [ECF No. 363]; 4) Order Granting-in-Part and Denying-in-Part Amended Motion for Summary Judgment Filed by LiveLife, LLC [ECF No. 364]; and 5) Transcript of the Bankruptcy Court's Oral Findings of Fact and Conclusions of Law, held on November 1, 2021 ("FFCL") [ECF No. 365].

The multi-million-dollar real estate transaction at the heart of this case was rendered fatally defective by the omission of a critical quitclaim deed and rushed drafting of closing documents. The Bankruptcy Court correctly acknowledged

---

[1] Where, as here, the ECF entry is set off in brackets it refers to the docket entry in the underlying bankruptcy action. Where the ECF entry is set off in parentheses, it refers to the docket entry in the instant appeal. For clarity, the Court cites to the bates stamp of documents filed in this appeal whenever possible.

that while negligence does not bar equitable subrogation under Nevada law equitable subrogation is nonetheless inappropriate based on the facts of this case. The Court affirms the decision of the Bankruptcy Court in full.

## II. BACKGROUND

This case involves competing interests in the real property described as 16 Soaring Bird Court, Las Vegas, NV 89135 (the "Property") that was owned by Arron Augustin Afflalo (the "Debtor") at all times relevant to this appeal. Appellant LiveLife, LLC ("LiveLife") and Appellee Bay Point Capital Partners, LP ("Bay Point") disagree about whether LiveLife owns a senior lien on the Property and, if so, whether Bay Point's interest is subordinate to that lien.

On June 26, 2014, Augustin Paris, LLC ("AP LLC") was organized as a limited liability company under the laws of the state of Nevada. *See* APP03274-APP03277. On July 15, 2014 Afflalo, as trustee of the D&A Trust, dated July 15, 2014 (the "Trust") and the sole member of AP, LLC, executed the operating agreement of AP, LLC (the "AP, LLC Operating Agreement) which named Afflalo as the manager of AP, LLC, and the Trust as the sole member of AP, LLC. *See* APP03278-APP03317.

On February 14, 2017, AP, LLC purchased the Property. *See* APP03318-APP03324. On April 12, 2017, Afflalo entered into a business loan agreement with East West Bank, dated April 17, 2017 (the "Bay Point Loan Agreement"). *See* APP03325-APP03332. The Bay Point Loan Agreement was evidenced by a note (the "Bay Point Note"). *See* APP03333-APP03339. East West Bank agreed to loan Afflalo $5,500,000 under the Bay Point Loan Agreement. *See id.*

On May 4, 2017, Afflalo granted BofI Federal Bank ("BofI"), a deed of trust (the "BofI DOT") against the property to secure a promissory note for $2,335,000, dated May 2, 2017 (the "BofI Note"), which, along with the Bay Point Loan Agreement, collectively constituted the Bay Point Loan Documents. *See* APP03440-APP03365. The BofI Note was scheduled to mature on June 1, 2047,

and was payable in equal monthly payments. *See* APP03333-APP03339.

On June 27, 2017, AP, LLC transferred the property to the Trust through deed of grant filed with the Clark County Recorder on July 6, 2017. *See* APP03366-APP03371. Also on June 27, 2017, the Trust transferred the Property to Afflalo in his individual capacity, via a deed of grant filed with the Clark County Recorder on July 11, 2017. *See* APP03372-APP03377.

On November 30, 2017, Bay Point Advisors, LLC, purchased East West Bank's rights under the Bay Point Loan Documents pursuant to a loan sale agreement between Bay Point Advisors, LLC, and East West Bank. *See* APP03378-APP03396. On January 8, 2018, Bay Point Advisors, LLC assigned its rights under the Bay Point Loan Agreement to Bay Point. *See* APP03397-APP03401. The same day, Bay Point and Afflalo entered into a forbearance agreement where Afflalo acknowledged that the principal amount due and owing to Bay Point under the Bay Point Note as of December 1, 2017 was $3,790,862.59, and that such amount would accrue interest at the rate of 14 percent per annum until paid off in accordance with the terms of the Bay Point Loan Agreement. *See* APP03402-APP03414.

Also on January 8, 2018, Afflalo granted Bay Point a deed of trust on the Property (the "Bay Point DOT") as consideration for the promises and obligations undertaken by Bay Point under the forbearance agreement. The Bay Point DOT was recorded with the Clark County Recorder on January 19, 2018, as security for the sum of $3,930,000. *See* APP03415-APP03445.

Also on January 8, 2018, Bay Point agreed to loan AP, LLC $430,000 (the "January 8th Loan Agreement"), and AP, LLC executed a secured promissory note, dated January 8, 2018 in the principal amount of $430,000 in favor of Bay Point (the "January 8th Note"). *See* APP03446-APP03473; APP03474-APP03479. The January 8th Note and the Bay Point Note are collectively the "Bay Point Notes." Afflalo personally guaranteed the obligations owing by AP, LLC to Bay

Point under the January 8th Note, pursuant to a guaranty, also dated January 8, 2018. *See* APP03480-APP03485.

On August 22, 2018, Afflalo applied for a loan with Civic Financial Services ("Civic"), who was unwilling to provide the requested loan to Afflalo because the value of the Property was too low. *See* APP03486-APP03492. Kendra Rommel ("Rommel"), an employee of Civic, referred the loan to David Rosenberg ("Rosenberg"), the Vice President of Macoy Capital Partners, Inc. *See* APP03509. Rommel remained involved in Afflalo's efforts to secure a new loan on the property (the "LiveLife Loan Transaction") even though she was not an employee of LiveLife. *See* APP03509-APP03510.

Afflalo's original loan application was provided to Demetrius Ware ("Ware") who was subsequently hired by JetClosing, Inc. ("JetClosing") and brought the loan with him to JetClosing. *See* APP03716. JetClosing eventually served as the title and escrow agent for the LiveLife transaction. *See id*. Afflalo's original loan application to Civic identified Afflalo as the borrower under the loan and stated that he would remain the owner of the Property in his individual capacity. *See* APP03792-APP03799. When the file was opened, JetClosing believed that Civic was going to be the lender and Afflalo was going to be the borrower. *See* APP03719.

Mr. Ware had a preexisting relationship with a loan officer at an entity called New Heights Lending, LLC, which resulted in New Heights being chosen as the mortgage broker for the LiveLife Loan Transaction. *See* APP03823.

LiveLife intended to have Afflalo transfer the property to AP, LLC, and to then have AP, LLC be the obligor and deed of trust grantor with respect to the Property, which would serve as collateral under the LiveLife loan transaction. *See* APP03519, APP03808.

On August 28, Ware changed the lender in JetClosing's file to New Heights. *See* APP03835-APP03837. On the same day, New Heights and LiveLife were aware

of the terms of the LiveLife Loan Transaction, including the new maturity date with a required balloon payment, an increased interest rate, and the identity of AP, LLC as the borrower. *See* APP03693, APP03838-APP03839, APP03840-APP03843.

No one informed JetClosing that Afflalo would not be the obligor and deed of trust grantor in his individual capacity until September 5, 2018, when JetClosing received the loan documents from LiveLife. *See* APP03721, APP03735.

On August 29, 2018, Afflalo informed Bay Point that he planned to refinance the BofI Note and requested that Bay Point enter into a subordination agreement in connection with that refinance but stated that Bay Point would continue to retain its lien in the second position. *See* APP03844-APP03850. Bay Point advised Afflalo that communications should be directed through its counsel, Thompson Hine LLP ("Thompson Hine"). *See* APP03898-APP03900. Christina Campbell, ("Campbell"), an attorney at Thompson Hine, served as the exclusive point of contact for communications with Bay Point. *See* APP03898-APP03900.

Also on August 29, 2018, Afflalo, Rommel, and Campbell participated in a conference call (the "August 29th Call") regarding Afflalo's desire to refinance the BofI note. *See* APP03536-APP03539, APP03546. There was no discussion of the terms of the refinancing during this call, including any discussion of terms of any note, deed of trust, or subordination agreement that would be part of the refinancing. *See* APP03536-3539. The August 29th Call was the only verbal communication between Campbell and Rommel. *See* APP03536, APP03631.

The same day, Rommel emailed JetClosing and requested that JetClosing prepare a subordination agreement. *See* APP04107. In her request, Rommel stated that "We have a VERY small w/o do, this AM to get this document emailed to Bay Point, or they will not sign, and this deal will die!" *See* APP04112. Bay Point never told anyone that there was any time pressure on the LiveLife Loan Transaction. *See* APP03605, APP01340.

As of August 30, 2018, JetClosing, Rommel, New Heights, Macoy, and LiveLife all knew that the LiveLife Note was going to have a one-year maturity date. *See* APP01340. Later that day, JetClosing ordered the subordination agreement from ReQuire, a third-party deed preparation service. *See* APP01340. At the time JetClosing ordered the subordination agreement, JetClosing believed that New Heights, rather than LiveLife, was going to be the lender under the proposed transaction. *See id.* JetClosing ordered the draft subordination agreement through ReQuire's online portal, which asks for the "major components of the documents" and provided ReQuire with the name of the borrower—which it believed to be Afflalo in his individual capacity at that time—the potential subordinating lender, the new lender, and the loan amount. *See* APP03725-APP03726, APP01340.

Jet Closing did not indicate to ReQuire that the subordination agreement needed to include terms that would create a lien against the property. *See* APP03780-APP03781.

The next day, August 31, 2018, ReQuire provided JetClosing with the requested draft subordination agreement. ("Subordination Agreement 1.0"). *See* APP04114-APP04120. Subordination Agreement 1.0 was between Afflalo in his individual capacity, Bay Point, and New Heights. It identified New Heights as the "Grantee for indexing purposes," and stated "Arron Afflalo, an unmarried man" as "individually or collectively 'Grantor' for indexing purposes and hereinafter 'Property Owner.'" *See* APP04116, APP01341.

On August 31, 2018, at 8:55 a.m. Pacific Time, Rommel sent Subordination Agreement 1.0 to Campbell, and copied Afflalo, LiveLife, and JetClosing. *See* APP04121-04127, APP01341. At 11:11 a.m., JetClosing indicated to ReQuire that Subordination Agreement 1.0 needed two revisions: a) the lender's name needed to be changed from New Heights to LiveLife; and b) the loan amount needed to be reduced from $3,930,000 to $3,150,000. *See* APP04128-APP04133, APP01341.

At 11:37 a.m., ReQuire returned the revised Subordination Agreement 1.0 with the requested changes, and Rommel sent Campbell the revised Subordination Agreement 1.0 at 11:59 a.m. *See* APP04121-APP04127, APP03726-APP03727, APP04134-APP04140, APP01342.

August 31, 2018 was the first time that Rommel learned that LiveLife would be the lender under the proposed LiveLife Loan Transaction. *See* APP03577.

At 12:18 p.m. on August 31, 2018, Campbell sent Rommel, Afflalo, LiveLife, and JetClosing a revised draft subordination agreement ("Subordination Agreement 2.0") containing a redline of her comments. *See* APP04141-APP04161, APP01342. Subordination Agreement 2.0 was between and among Afflalo individually, Bay Point, and New Heights—rather than LiveLife—as the refinancing lender. *See id.*

At 12:25 p.m. on August 31, 2018, Rommel sent Campbell an email indicating that Subordination Agreement 2.0 needed to be revised to change the refinancing lender to LiveLife. *See id.*

At 12:26 p.m. on August 31, 2018, Bay Point received an email from Campbell that included Subordination Agreement 2.0. *See id.*

At 12:30 p.m. on August 31, 2018, Campbell sent Rommel, Afflalo, JetClosing, and LiveLife a newly revised draft subordination agreement between and among Afflalo, Bay Point, and LiveLife that changed the refinancing lender from New Heights to LiveLife. ("Subordination Agreement 3.0"). *See* APP04175-APP04185, APP01342.

Campbell never sent Subordination Agreement 3.0 to Bay Point. *See* APP03955-APP03957. As a result, Bay Point signed Subordination Agreement 2.0 (the "Bay Point Executed Subordination Agreement"). *See* APP038657, APP03971-APP03972, APP03986.

At 4:28 p.m. Afflalo circulated Afflalo's signature page (the "Afflalo Signature Page") without the remaining pages of Subordination Agreement 3.0 that Afflalo

had signed, to Campbell, LiveLife, and JetClosing. *See* APP04186-APP04188.

Five minutes later, at 4:33 p.m., Campbell circulated the Bay Point Executed Subordination Agreement (Subordination Agreement 2.0), which included the full version of Subordination Agreement 2.0 signed by Bay Point, to Rommel, LiveLife, and JetClosing. *See* APP04189-APP04198.

On Labor Day, September 3, 2018, LiveLife ordered loan documents prepared "on a super-duper rush" by the Geraci Law Firm. This was the first time LiveLife and/or Macoy Capital had requested that loan documents be prepared in connection with this transaction. *See* APP04199-APP04200, APP01344.

The next day, September 4, 2018, Bay Point sent the originally signed Bay Point Executed Subordination Agreement (Subordination Agreement 2.0) to JetClosing at its Seattle, Washington address, as requested by the closing agent, Rachel Burham ("Burham"). *See* APP04201-APP04206, APP03990-APP03991, APP01344.

Afflalo also sent his original signed copy of Subordination Agreement 3.0 (the "Afflalo Signed Subordination Agreement"), to JetClosing's offices in Seattle. *See* APP04201-APP04206, APP01344. LiveLife sent its signed copy of Subordination Agreement 3.0 (the "LiveLife Signed Subordination Agreement"), to JetClosing offices in Las Vegas, Nevada. *See* APP04207-APP04215, APP01344.

On September 5, 2018, JetClosing received the Bay Point Executed Subordination Agreement and the Afflalo Signed Subordination Agreement at its offices in Seattle, Washington. *See* APP04216-APP04237, APP01344.

The same day, Shawna Hernandez ("Hernandez"), the Vice President of operations for JetClosing and the supervisor of the escrow personnel who closed the LiveLife Loan Transaction, sent an email to Burham, indicating that the Bay Point Executed Subordination Agreement (Subordination Agreement 2.0), and the Afflalo's Signed Subordination Agreement (Subordination Agreement 3.0), had arrived in Seattle. A signed copy of Subordination Agreement 2.0 and

Subordination Agreement 3.0 were attached to Hernandez's email. *See* APP04216-APP04233, APP03772, APP01345. The only copy of a Subordination Agreement signed by Afflalo JetClosing received was attached to Hernandez's September 5, 2018 email. *See id.*

Also on September 5, 2018, LiveLife received the draft loan documents from the Geraci Law Firm. Missing from the fourteen draft loan documents was a draft granting deed that would have transferred ownership of the Property from Afflalo in his individual capacity to AP, LLC. *See* APP04238-APP04364, APP01345. Janet Nelson, the assistant to Vice President David Rosenberg at Macoy Capital, was assigned to review the loan documents prepared by the Geraci Law Firm to identify any errors in the documents. *See* APP03700, APP01345.

Also on September 5, 2018, JetClosing: 1) received the draft loan documents for the first time; 2) learned for the first time that AP, LLC and not Afflalo individually was going to be the borrower under the LiveLife Loan Transaction; 3) learned that AP, LLC and not Afflalo was going to be the grantor with respect to the deed of trust securing the obligations owed under the LiveLife Loan Transaction; and 4) received a copy of the lender's closing instructions for the first time. *See* APP03749-APP03750, APP03752, APP01346, APP03734.

The lender's closing instructions do not list or otherwise reference a quitclaim deed or grant deed related to the Property from Afflalo in his individual capacity to AP, LLC among the various documents needed for the closing. *See* APP02755-APP02762.

Later on September 5, 2018, Afflalo signed the loan documents (collectively, the "LiveLife Loan Documents") for the LiveLife Loan Transaction. *See* APP03739.

The note evidencing the debt owed to LiveLife under the LiveLife Loan Agreement (the "LiveLife Note"), identifies AP, LLC as the borrower. *See* APP02432-APP02439. Afflalo is not mentioned anywhere in the LiveLife Note in his individual capacity. *See* APP02432-APP02439.

9

The escrow supplemental closing instructions (the "Supplemental Closing Instructions"), which were signed by JetClosing and Afflalo and sent to LiveLife, state that JetClosing is to issue a title policy with respect to the property showing the borrower as AP, LLC, but also state that "title vested in Arron Afflalo, an unmarried man." *See* APP01346. The Supplemental Closing Instructions provide check boxes to indicate if named documents are included. Boxes next to the promissory note, the deed of trust, and documents required by the lender are checked. Named, but without a checked box signifying its inclusion, is a quitclaim deed. [*See* ECF No. 277-5, Ex. 49].

The LiveLife Note, which is dated September 5, 2018, had a maturity date of October 1, 2019—about a year after the note was executed. A balloon payment of $3,176,223.75 was due on October 1, 2019. The note required monthly interest payments of $26,223.75, beginning May 1, 2019, with interest through April 1, 2019 having been prepaid with the proceeds of the LiveLife Loan Transaction. *See* APP02432-APP02439, APP01348.

The deed of trust securing the LiveLife Note was executed by Afflalo solely in his capacity as manager of AP, LLC. *See* APP02440-APP02476. The deed of trust further provides that AP, LLC is granting a security interest in the property. *See id.* The deed of trust was recorded with the Clark County Recorder's Office on September 7, 2018, as Instrument Number 20180907-0000954. *See id.*

The LiveLife Loan Transaction contemplated LiveLife receiving not less than $440,685 in interest and fees. *See id.*

No funds from the LiveLife Loan Transaction were disbursed directly to Afflalo. JetClosing disbursed all funds to AP, LLC as the borrower under the LiveLife Loan Documents. *See* APP03749.

On September 6, 2018, the loan transaction was closed and disbursements were made to the various participants pursuant to the final settlement statement. *See* APP02765-APP02766.

JetClosing affixed the signature page from the Bay Point Executed Subordination Agreement (Subordination Agreement 2.0) and the signature page from the Afflalo Signed Subordination Agreement (Subordination Agreement 3.0), and hand delivered that document to the Clark County Recorder's Office on September 7, 2018, for recording as Instrument Number 20180907-0000955 (the "Recorded Subordination Agreement"). *See* APP02421-APP02431.

Bay Point never received Subordination Agreement 3.0. *See* APP03867, APP03971- APP03972, APP03986, APP03990-APP03991, APP04033, APP04059-APP04060.

Bay Point never gave JetClosing permission to affix the signature page from the Bay Point Executed Subordination Agreement to Subordination Agreement 3.0. *See* APP03971-APP03972, APP04034, APP04054. Thompson Hine never told JetClosing that it was permitted to affix the signature page from the Bay Point Executed Subordination Agreement to Subordination Agreement 3.0. *See id.*

Neither Bay Point nor Thompson Hine received a copy of the Recorded Subordination Agreement. *See* APP03980-APP03982. Neither Bay Point nor Thompson Hine received copies of the LiveLife Loan Documents. *See* APP03749, APP03789, APP03995, APP04003-APP04004.

No grant deed transferring the property from Afflalo to AP, LLC was ever prepared or filed in the Clark County Recorder's Office. *See* APP01353. LiveLife never received a grant deed transferring the property from Afflalo to AP, LLC. *See id.*

On June 20, 2019, Macoy Capital reached out to JetClosing, and for the first time inquired about the grant deed transferring the property from Afflalo to AP, LLC. *See* APP03740.

Neither Afflalo, nor LiveLife, nor Macoy Capital, nor New Heights, nor JetClosing, nor Rommel ever told Bay Point or Thompson Hine: 1) the refinancing would result in an acceleration from a 30-year amortized note maturing in 2047

11

to a one year note with a balloon payment due in 2019; 2) the refinancing would require Afflalo to transfer the property out of his own name and into the name of AP, LLC; or 3) the change in obligor under the LiveLife Note from Afflalo to AP, LLC. *See* APP04023-APP04024, APP01355-APP01359, APP03753, APP04085-APP04086.

Neither Bay Point nor Thompson Hine were aware of: 1) the fact that refinancing would require Afflalo to transfer the property out of his own name and into AP, LLC; or 2) the change in obligor from Afflalo individually to AP, LLC under the LiveLife Note. *See* APP04023-APP004024, APP04085-APP004086.

Thompson Hine was not aware that the refinancing would result in an acceleration of the refinanced loan obligation from a 30-year amortized note maturing in 2047 to a one-year note with a balloon payment due in 2019. *See* APP04023, APP01359.

Bay Point understood that the proposed restructuring would not accelerate the maturity date. *See* APP03902-03904, APP03945-03949, APP04023.

Bay Point further believed that LiveLife knew that any acceleration of the maturity date from that date set forth in the BofI note was a material issue to Bay Point, based on the amendments made to the draft subordination agreement as reflected in Subordination Agreement 2.0. *See* APP03902-APP03904, APP03945-APP03949, APP04024, APP04043.

Bay Point relied on the inclusion of Afflalo in his individual capacity in the Bay Point Executed Subordination Agreement (Subordination Agreement 2.0), informing its belief that Afflalo would be, first, the obligor under any debt resulting from the refinancing transaction related to such agreement, and second, as the owner of the property after the closing of any refinancing transaction related to such agreement. *See* APP04095.

The Property is the only collateral securing the amounts due to Bay Point under the Bay Point Notes. *See* APP03873.

Campbell did not have authority to bind Bay Point to any agreements. *See* APP03971-APP003972, APP04032, APP04096-APP04097.

Bay Point never told anyone at Thompson Hine, including Campbell, that Campbell had authority to bind Bay Point to any agreements. *See* APP03899, APP04032. Nobody at Thompson Hine, including Campbell, ever told anyone that Thompson Hine or Campbell had any authority to bind Bay Point to any agreements. *See* APP03665-APP03669, APP03971-APP03972, APP04032.

JetClosing did not communicate with Bay Point regarding either the LiveLife loan transaction or the subordination agreements related to that transaction. *See* APP03728, APP03745.

Rommel did not communicate with LiveLife or Macoy Capital, New Heights or JetClosing regarding the terms of the draft subordination agreements that were circulated in connection with the LiveLife loan transaction. *See* APP03530-APP03533, APP03541. Rommel did not communicate with LiveLife, Macoy Capital, or JetClosing regarding the terms of the LiveLife loan transaction and Rommel did not communicate at all with ReQuire. *See* APP03545-APP03541, APP03750, APP03780, APP01362. Rommel did not serve in any capacity with LiveLife, and/or Macoy Capital in the LiveLife loan transaction. *See* APP03690. JetClosing did not have any oral communications with LiveLife or Macoy Capital. *See* APP03780. LiveLife and Macoy Capital did not have any communications with ReQuire. *See* APP03695.

On September 7, 2018, the LiveLife Loan Transaction was closed by JetClosing, and a payment of $2,331,057.46 was made to BofI Federal Bank in full satisfaction of the BofI loan and deed of trust. *See* APP02765-APP02769.

JetClosing, as escrow agent, did not record a grant deed or a quitclaim deed at the close of the LiveLife loan transaction escrow, transferring the property from Afflalo in his individual capacity to AP, LLC. LiveLife was unaware of that fact. *See* APP02480.

Shortly after the loan was issued by LiveLife, Afflalo listed the property for sale. *See* APP02753.

In late March 2019, Afflalo reached a deal to sell the property, and contacted LiveLife to obtain payoff information for the LiveLife loan. *See* APP02753.

Rosenberg spoke with Charles Andros of Bay Point by telephone on April 2, 2019 to discuss Afflalo's sale of the property because it would not generate sufficient proceeds to pay both the LiveLife loan and the Bay Point loan. Mr. Andros acknowledged that Bay Point held a second priority lien behind LiveLife's lien and agreed that Bay Point would accept a payment of $100,000 in satisfaction of Bay Point's deed of trust. *See* APP02752.

On April 4, 2019 (the "Petition Date"), Afflalo filed a voluntary Chapter 7 bankruptcy petition. At that time, the Property was under contract to be sold. *See* APP02754.

As of the Petition Date, Afflalo was current on all payments due under the LiveLife loan, and no default existed under the LiveLife Loan. *See id.*

On May 3, 2019, Afflalo filed a motion to sell the property for $3,376,000. *See* APP06306-APP06391.

Afflalo signed the purchase agreement on April 9, 2019, five days after the date of the bankruptcy. *See* APP06306-APP06391.

On July 15, 2019, the Court granted the motion to sell and ordered that the sale proceeds, $3,376,000 be held by the trustee until such time as the Court could resolve the issue of the priority of interests on the Property as between Bay Point and LiveLife. *See* APP06296-APP06305.

On August 16, 2019, LiveLife initiated an adversary proceeding by filing a complaint (the "Complaint") asserting causes of action against Bay Point and AP, LLC for: (a) Declaratory Relief / Lien Validity and Priority (against Bay Point); (b) Alternative Claim under Bankr. Rule 7008(d), Equitable Subrogation / Declaratory Relief (against Bay Point); (c) Equitable Estoppel (against Bay Point);

(d) Alter Ego (against Augustin Paris, LLC). *See* APP06284-APP06295.

On April 2, 2020, Bay Point filed an Amended Answer to Complaint, Counterclaim, and Third-Party Complaint (the "Answer"). In its Answer, Bay Point asserted the following causes of action against LiveLife and the Trustee: (a) Declaratory Relief; (b) Fraud; (c) Turnover of Sale Proceeds (against Trustee). *See* APP05840-APP06058.

On October 22, 2019, the Trustee Shelley D. Krohn ("Trustee") filed her *Answer to Third-Party Complaint and Counterclaim* (the "Trustee Counterclaim") asserting causes of action against LiveLife for: (a) Avoidance of Deed of Trust Pursuant to 11 U.S.C. § 544(a) Against LiveLife; (b) For a Declaration that LiveLife Does Not Hold A Perfected Deed of Trust In the Property. *See* APP06082-APP06093.

On May 15, 2020, LiveLife filed a *Motion for Partial Summary Judgment. See* APP05246-APP05248.

On June 4, 2020, the Trustee filed a *Motion for Summary Judgment Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56. See* APP05185-APP05204.

On August 3, 2020, Bay Point Capital Partners filed a *Motion for Summary Judgment Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56. See* APP03242-APP03252.

On August 4, 2020, LiveLife LLC filed *LiveLife, LLC's Motion for Summary Judgment on All Claims Against or Asserted by Bay Point Capital Partners, LP. See* APP03202-APP03241.

On November 1, 2021, the Bankruptcy Court delivered an oral ruling resolving all pending motions for summary judgment ("FFCL") [ECF No. 365].

On November 10, 2021, the Bankruptcy Court entered an *Order Denying Motion for Partial Summary Judgment Filed by LiveLife, LLC* [ECF No. 361]. (APP00001-APP000003).

On November 10, 2021, the Bankruptcy Court entered an *Order Granting Motion for Summary Judgment Filed by Counterclaimant, Third-party Defendant, and Chapter 7 Trustee Shelley D. Krohn* [ECF No. 362] (APP00004-APP000006).

On November 10, 2021, the Bankruptcy Court entered an *Order Granting Motion for Summary Judgment Filed by Bay Point Capital Partners, LP* [ECF No. 363] (APP00007-APP00009).

On November 10, 2021, the Bankruptcy Court entered an *Order Granting in Part and Denying in Part Amended Motion for Summary Judgment Filed by LiveLife, LLC* [ECF No. 364] (APP00007-APP00009).

On November 24, 2021, LiveLife filed its Notice of Appeal and Statement of Election. (ECF No. 2).

On December 28, 2021, the Deputy Clerk of the U.S. Bankruptcy Court certified that the record on appeal is complete. (ECF No. 3).

## III.        LEGAL STANDARD

### 1. Bankruptcy Appeal

On appeal "the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *In re R & S St. Rose, LLC*, 611 B.R. 119, 127 (D. Nev. 2019); *see also* Fed. R. Bankr. P. 8013 advisory committee's note; 28 U.S.C. § 158(a)(1).

A bankruptcy court's conclusions of law are reviewed de novo, "including its interpretation of the Bankruptcy Code," and its factual findings are reviewed for clear error. *In re Rains*, 428 F.3d 893, 900 (9th Cir. 2005); *In re Salazar*, 430 F.3d 992, 994 (9th Cir. 2005). The bankruptcy court's factual findings are clearly erroneous only if the findings "leave the definite and firm conviction" that the bankruptcy court made a mistake. *In re Rains*, 428 F.3d at 900. "A bankruptcy court abuses its discretion if it applies the law incorrectly or if it rests its decision on a clearly erroneous finding of a material fact." *In re Brotby*, 303 B.R. 177, 184

(9th Cir. BAP 2003); *see also In re Plyam*, 530 B.R. 456, 461 (9th Cir. BAP 2015) ("A bankruptcy court abuses its discretion if it applies the wrong legal standard, misapplies the correct legal standard, or if its factual findings are illogical, implausible, or without support in inferences that may be drawn from the facts in the record.")

In reviewing a bankruptcy court's decision, this Court ignores harmless errors. *In re Mbunda*, 484 B.R. 344, 355 (9th Cir. BAP 2012). The Court may affirm the Bankruptcy Court's decision "on any ground fairly supported by the record." *In re Warren*, 568 F.3d 1113, 1116 (9th Cir. 2009) (citation omitted). In addition, the Court need not address arguments not raised in the trial court but "may do so to (1) prevent a miscarriage of justice or to preserve the integrity of the judicial process, (2) when a change of law during the pendency of the appeal raises a new issue, or (3) when the issue is purely one of law." *In re Lakhany*, 538 B.R. 555, 560 (9th Cir. BAP 2015).

**2. Summary Judgment**

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough

'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party satisfies Rule 56's requirements, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## IV. DISCUSSION

LiveLife argues that it holds a valid, first-priority lien against the Property, whether it is created in law or equity by the Subordination Agreement on its own, or in conjunction with the other LiveLife Loan Documents. LiveLife further argues that if these arguments fail, it is entitled to equitable subrogation as it assumed it was stepping into the shoes of the former first-priority lender, BofI, when it paid off the BofI Note. Bay Point argues that LiveLife holds no valid lien against the

Property due to mistakes made during the transaction—namely, the absence of a deed granting the Property from Afflalo individually to AP, LLC. Like the Bankruptcy Court, this Court finds that LiveLife holds no valid lien against the Property due to various defects with the transaction, and that equitable subrogation is inappropriate here under Nevada law.

### A. Mortgage Lien

LiveLife argues that the Bankruptcy Court erred as a matter of law in determining LiveLife holds no valid mortgage lien against the Property, (ECF No. 10 at 45),[2] and makes three arguments in support of this proposition. First, LiveLife admits that the LiveLife Deed of Trust alone does not create a lien, but argues that the language of the Recorded Subordination Agreement, when read together with the LiveLife Deed of Trust, "evidences Afflalo's individual intent to create a lien. . . ." (ECF No. 10 at 51). Second, LiveLife argues that Afflalo adopted and ratified the LiveLife Deed of Trust as a lien against the property. (*Id.*) Third, LiveLife argues that notwithstanding the fact that Bay Point never signed the Recorded Subordination Agreement, LiveLife has an equitable mortgage against the Property. (*Id.* at 52).

### 1. Subordination Agreement

LiveLife argues that the Recorded Subordination Agreement, standing alone, meets the elements under Nevada law to create a valid "lien" or "mortgage" against the subject Property, in favor of LiveLife. (ECF No. 10 at 46-47). The Bankruptcy Court certified a question of whether a Subordination Agreement could constitute a lien to the Nevada Supreme Court, which declined to consider the question. *See* APP00628-APP00629. The Bankruptcy Court subsequently determined that the Recorded Subordination Agreement alone did not create a lien. This Court agrees.

---

[2] Unless otherwise noted, page number citations to docket entries in the appeal are to the blue docket text that appears at the top of each page, not the brief's pagination.

In Nevada, "[a] mortgage is usually considered to be a nominal conveyance, held in abeyance, of certain property as a security for the payment of certain debt. If the parties intend to create a mortgage, no particular form of instrument or words is necessary to create an equitable mortgage." *Nee v. L.C. Smith, Inc.* 97 Nev. 42, 47-8, 624 P.2d 4, 7 (1981) (internal citations omitted). "Under Nevada law, when, as in this case, it is claimed that a lien arises out of an express contract, the parties' intent to create the lien must be clearly indicated on the face of the agreement." *Gonzales v. Shotgun Creek Las Vegas, LLC.*, 577 F. App'x 709, 710 (9th Cir. 2014) (citing *Union Indem. Co. v. A.D. Drumm, Jr., Inc.*, 57 Nev. 242, 70 P.2d 767, 768 (1937)).

While *a* Subordination Agreement might create a valid lien under Nevada law, *this* Recorded Subordination Agreement clearly contemplates that another document—the Deed of Trust signed by Afflalo as manager of his LLC, rather than in his individual capacity—will create the lien. *See* APP02424 ("WHEREAS, Property Owner has executed, or is about to execute a Deed of Trust and Note. . . . . WHEREAS, it is a condition precedent to obtaining said loan that the Superior Deed of Trust last above mentioned shall unconditionally be and remain at all times a lien or charge upon the land . . . .") Therefore, there is no indicia of intent by the parties that the Recorded Subordination Agreement independently created a lien. To decide that this Subordination Agreement independently creates a lien would render superfluous the language of the Agreement which contemplates the lien being created via the Deed of Trust. A Court must give effect to all the language of a contract. *See, e.g.*, *Musser v. Bank of Am.*, 114 Nev. 945, 964 P.2d 51, 54 (1998) ("A basic rule of contract interpretation is that '[e]very word must be given effect if at all possible.'") (citation omitted); *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."); *Sturges v. Crowinshield*, 17 U.S. (4 Wheat.) 122, 202 (1819) ("It would be dangerous in the extreme, to infer from extrinsic circumstances, that a

20

case for which the words of an instrument expressly provide, shall be exempted from its operation.") The Subordination Agreement, standing alone, does not create a lien against the Property in favor of LiveLife.[3]

### 2. Deed of Trust

While LiveLife concedes that the Deed of Trust does not provide a valid security interest against the Property, (ECF No. 10 at 51 ("The mistake made by the escrow agent caused the LiveLife Deed of Trust, on its own, to be deficient in creating the lien. . . .")), the Court agrees with the Bankruptcy Court that the Deed of Trust does not grant a valid security interest against the Property. As discussed above, Afflalo held title to the Property in his own name both before and after the refinancing transaction. AP, LLC, had no ownership interest in the Property at the time of the refinancing transaction, and Afflalo never transferred title to AP, LLC.

It is well-established under Nevada law that a grantor can convey no greater title or interest than he or she has in the property. *See, e.g., Brophy Min. Co. v. Brophy & Dale Gold & Silver Min. Co.*, 15 Nev. 101 (1880). "Nevada is a race-notice recording state, wherein any interest in real property, properly recorded, has priority over subsequently filed interests." *Freedom Mortg. Corp, v. Trovare Homeowners Ass'n*, No. 2:11-CV-01403-MMD, 2012 WL 5986441, at *3 (D. Nev. Nov. 28, 2012) (citing NRS 111.320, 111.325; *Buhecker v. R.B. Petersen & Sons Consr. Co.,* 112 Nev. 1498, 929 P.2d 937, 940 (1996)).

AP, LLC is listed as the borrower on the LiveLife Note. *See* APP02433. AP, LLC

---

[3] The Court considered but gives little weight to the expert report of Charles Hansen as Hansen wrote the report assuming that Bay Point signed the Recorded Subordination Agreement, which it did not. *See* APP01873 (Hansen's report, dated January 22, 2020, assumes that each signature to the Subordination Agreement is "proper"; APP01691 (additional versions of Subordination Agreement not provided to Hansen until the morning of his May 29, 2020 deposition); APP01856 (Hansen not aware of discrepancy in what version of the Subordination Agreement Bay Point signed until July 9, 2020).

is also listed as the trustor/borrower on the recorded LiveLife Deed of Trust which was intended to secure the LiveLife Note. *See* APP02440-APP02447. As noted, nowhere in the LiveLife Deed of Trust does Afflalo grant any interest in the Property in his individual capacity to LiveLife. Therefore, AP, LLC could not grant a valid security interest to LiveLife via the Deed of Trust because AP, LLC had no interest to grant.

As Nevada is a race-notice recording state the LiveLife Deed of Trust perfects nothing with regards to the Property because it would not appear in the chain of title to the Property as the title holder was at all relevant times Afflalo in his individual capacity. As a "wild deed," the recorded LiveLife Deed of Trust would not appear in the chain of title of the property. For all of these reasons, the Court agrees with the Bankruptcy Court that the LiveLife Deed of Trust did not create a valid security interest or mortgage against the Property.

**B. Adoption and Ratification**

LiveLife next argues that Afflalo adopted and ratified the LiveLife Deed of Trust as a lien against the property because the Recorded Subordination Agreement contained language that the LiveLife Deed of Trust "shall . . . be and remain at all time a lien or charge on the property therein described. . . ." *See* APP02425.

"Generally, contract ratification is the adoption of a *previously formed* contract, notwithstanding a quality that rendered it relatively void and by the very act of ratification that party affirming becomes bound by it and entitled to all proper benefits from it." *Merrill v. DeMott,* 113 Nev. 1390, 951 P.2d 1040, 1044 (1997) (emphasis added); *see also Clarke v. Lyon Cnty.*, 7 Nev. 75, 81 (1871) ("[T]here can be no such ratification when the very existence of the contract is unknown.")

LiveLife's ratification argument fails. It is impossible to ratify a document that has not even been drafted at the time of the alleged ratification because ratification applies to contracts formed prior to the ratification. Here the Deed of

Trust was not drafted at the time the Afflalo signed the Recorded Subordination Agreement. In fact, LiveLife did not request its attorneys draft the Deed of Trust until three days after Afflalo signed the Recorded Subordination Agreement in the name of AP, LLC. *See* APP04200.

More importantly, and as the Bankruptcy Court concluded, Afflalo never transferred his interest in the Property to AP, LLC due to the missing quitclaim deed. The Court agrees with the Bankruptcy Court: any ratification would be of a hollow document that can convey no interest to LiveLife because no interest in the Property was ever conveyed to AP, LLC.

### C. Equitable Mortgage

Next, LiveLife argues that the Bankruptcy Court erred by not recognizing LiveLife's equitable mortgage against the Property. (ECF No. 10 at 52-53). LiveLife notes that Afflalo testified in three separate depositions that his intention was to create a first-priority lien in favor of LiveLife when he signed the LiveLife Loan Documents, and avers that when read together, the LiveLife Loan Documents create an equitable mortgage against the property.

"Under Nevada law, when . . . it is claimed that a lien arises out of an express contract, the parties' intent to create the lien must be clearly indicated on the face of the agreement." *Gonzales v. Shotgun Creek Las Vegas, L.L.C.*, 577 F. App'x 709 (9th Cir. 2014) (citing *Union Indem. Co. v. A.D. Drumm, Jr., Inc.*, 70 P.2d 767, 768 (1937) (per curiam)).

LiveLife relies on the Recorded Subordination Agreement for the proposition that an equitable mortgage or lien should be imposed on its behalf. But, as the Bankruptcy Court held, the Recorded Subordination Agreement is invalid and cannot bind Bay Point. There is no version of the Subordination Agreement that was signed by Bay Point, LiveLife, and Afflalo. Bay Point did not sign the Recorded Subordination Agreement, and the version of the Agreement it signed was never recorded. The Recorded Subordination Agreement is an amalgamation of pages

from Subordination Agreement 2.0 and Subordination Agreement 3.0. Subordination Agreement 2.0 and 3.0 each identified different lenders—New Heights in version 2.0, and LiveLife in version 3.0. The identity of the lender is a fundamental element in any Subordination Agreement. *See 26 Beverly Glen, LLC v. Wykoff Newberg Corp.*, 334 Fed. Appx. 62 at 63-64 (9th Cir. 2009) (citing *Tri-Pacific Com. Brokerage, Inc. v. Boreta*, 113 Nev. 203, 931 P.2d 726, 727 (1997) ("[T]he identity of the seller is an essential element of a contract, and thus parol evidence may not be used to clear of the ambiguity of 'ETAL.'")). Moreover, the Recorded Subordination Agreement is missing the last page of the agreement, and, like the Bankruptcy Court, this Court will not speculate as to whether the page missing from the recorded agreement is the page appearing at APP02418.

In sum, the Court finds that these various deficiencies are more serious than a minor error which would permit this Court to find an equitable lien created in this instance. To decide that Bay Point agreed to the Subordination Agreement would require this Court to countenance the appending of a signature to one version of a document to a second version with different material terms. Considered together, these errors are especially fatal because NRS § 106.220 provides that "Any instrument by which any . . . interest in real property is subordinated . . . must be recorded . . . . The instrument is not enforceable . . . unless and until it is recorded." NRS § 106.220. Here, the Subordination Agreement Bay Point signed (2.0) was not the version that was recorded. Therefore, the Recorded Subordination Agreement cannot be enforced against Bay Point.

The Court agrees with the Bankruptcy Court that when the Recorded Subordination Agreement is removed from the set of documents LiveLife argues should be considered, the remaining documents—the LiveLife Note, LiveLife Deed of Trust, and guarantee—do not reflect a clear intent to create a lien on the Property. The Property is not mentioned in the guarantee, the LiveLife Note makes

no reference to Afflalo or the Property, and the LiveLife Deed of Trust conveys no interest as AP, LLC did not hold title to the Property at the time of the transaction.

Perhaps cognizant of these deficiencies, LiveLife further argues that Bay Point entered into the Recorded Subordination Agreement with LiveLife and that it should therefore bind Bay Point now, notwithstanding the fact that Bay Point never signed the Recorded Subordination Agreement. As support, LiveLife makes two main arguments: 1) Bay Point admitted in its Answer and Amended Answer that it entered into a Subordination Agreement with LiveLife (when the Recorded Subordination Agreement is between Bay Point and New Heights) (ECF No. 10 at 58-60); and 2) Bay Point is bound by the actions of Campbell because she possessed actual or apparent authority to act on its behalf. (*Id.* at 60-62). Neither argument is availing.

First, Bay Point did not discover the error in its Amended Answer until after the Amended Answer was drafted and filed. *See* APP06541-91; (ECF No. 42 at 63). LiveLife attempts to capitalize on the late discovery of multiple versions of the Subordination Agreement by arguing that Bay Point's error is binding, but in the Ninth Circuit when "the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir. 1995). Moreover "[a]ny deliberate, clear, and unequivocal statement, either written or oral, made in the course of a judicial proceeding, qualifies as a judicial admission." *Scarff v. Intuit, Inc.*, 318 F. App'x 483, 487 (9th Cir. 2008) (citation omitted).

The Court concludes that Bay Point's alleged admission was not deliberate. Bay Point cited the correct version of the Subordination Agreement (2.0) in its Counterclaim and Third-Party Complaint filed simultaneously with its Amended Answer. *See* APP05854. Further, the Court finds that Bay Point retracted its alleged admission by subsequently clarifying that it did not sign the Recorded

Subordination Agreement in multiple pleadings during the underlying bankruptcy litigation and again in this appeal.

Second, Campbell had neither actual nor apparent authority to bind Bay Point. LiveLife appears to concede that Campbell did not have actual authority, (*see* ECF No. 56 at 37), but the Court discusses it for the sake of completeness.

The Supreme Court of Nevada defines actual authority as follows: "'[a]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.' When examining whether actual authority exists, we focus on an agent's reasonable belief." *Simmons Self-Storage v. Rib Roof, Inc.*, 130 Nev. 540, 331 P.3d 850, 856 (2014), *as modified on denial of reh'g* (Nov. 24, 2014) (quoting Restatement (Third) of Agency § 2.01 (2006)).

There is no evidence of actual authority. Campbell herself never believed she had authority to enter into agreements on Bay Point's behalf. *See* APP02869. Bay Point never told Campbell she could sign a subordination agreement on their behalf. *See id.* Gregory Jacobs, manager for Bay Point, signed Subordination Agreement 2.0, not Campbell. *See* APP04190-98. In his 30(b)(6) deposition, Jacobs testified that only a Bay Point employee—and no one at Thompson Hine— was authorized to sign the Subordination Agreement. *See* APP04032.

As to apparent authority, LiveLife argues that Bay Point admitted "it made Campbell its exclusive agent with regard to negotiating and approving the Subordination Agreement" because 1) Bay Point told Afflalo that communications should be directed through its counsel, Thompson Hine; and 2) Campbell served as the exclusive point of contact for communications to Bay Point. (ECF No. 56 at 36). Further, Bay Point argues that Campbell's authority to act on Bay Point's behalf in "negotiating and approving the Subordination Agreement was confirmed by Campbell to Afflalo and Rommel. . . ." (*Id.* at 37). This last point holds no water.

Rommel herself understood that Campbell could not execute the Subordination Agreement, as evidenced by her asking Campbell to "have Bay Point execute and notarize" a draft of the Subordination Agreement. *See* APP04142; *see also* APP03669.

Therefore, the Court focuses on whether apparent authority exists based on Bay Point's statement to Afflalo that all communications should be directed through Thompson Hine and Campbell's designation as "the exclusive point of contact for communications to Bay Point."

"Apparent authority is 'that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence. *Dixon v. Thatcher*, 103 Nev. 414, 742 P.2d 1029, 1031 (1987) (quoting *Myers v. Jones*, 99 Nev. 91, 657 P.2d 1163, 1164 (1983)). "[T]here can be reliance only upon what the principal himself has said or done, or at least said or done through some other and authorized agent. The acts of the agent in question can not be relied upon as alone enough to support [this theory]. If his acts are relied upon [,] there must also be evidence of the principal's knowledge and acquiescence in them. Moreover, . . . the reliance must have been a reasonable one. . . ." *Simmons Self-Storage*, 331 P.3d at 856 (quoting *Ellis v. Nelson*, 68 Nev. 410, 233 P.2d 1072, 1076 (1951)).

Here, LiveLife offers no persuasive evidence that Bay Point held Campbell out as having authority to bind Bay Point to the Subordination Agreement. Telling a customer to direct his communications through counsel plainly is not equivalent to telling that customer that counsel has the authority to bind the principal to a contract. Therefore, under *Simmons* and *Ellis*, LiveLife must show that it reasonably relied on some act by Campbell, and that Bay Point knew of and acquiesced to that act.

LiveLife alleges the following acts by Campbell gave rise to its understanding

of apparent authority: 1) a phone call on August 30, 2018 in which LiveLife alleges Campbell held herself out as Bay Point's agent (APP02788); and 2) two emails. *See* APP02825-02826; APP02258-02259. (ECF No. 10 at 62).

The phone call does not contain any evidence of apparent authority. No employee of Bay Point was on the call. Furthermore, by Rommel's own admission the August 30, 2018 phone call did not contain any acts by Campbell upon which Rommel could reasonably rely; Rommel herself testified that she was "concerned" about the extent of Campbell's authority, and advised Afflalo to "make sure she has the authority to give [Afflalo] answers correctly." *See id.*

The first email is similarly devoid of apparent authority to bind Bay Point. *See* APP02826. Campbell's only words are "Hi Arron, I'll call you back in a minute. I have to get something done for Bay Point for a closing happening today. Thanks! Christina." *Id.* No actor would reasonably rely on this communication to determine that Campbell had authority to bind Bay Point.

In the second email LiveLife relies on, a third party, Grant Carter, emails Campbell and writes "I am sending over the Subordination Agreement for your review and / approval on behalf of Aaron Afflalo." *See* APP02259. Later, he writes "Please review and contact Greg or myself with any questions or concerns." *See id.* Carter copies Greg Jacobs, manager of Bay Point, on the email. LiveLife's argument relies entirely on the "review and / approval" language, (*See* ECF No. 10 at 28), while entirely ignoring the context of the email where Carter requests Campbell to contact the manager of Bay Point—Greg Jacobs—or himself with any questions. Based on the email in its entirety, no reasonable actor would reasonably rely on "review / approval" to signal Campbell's alleged authority to bind Bay Point, especially because the author of the email is not a Bay Point employee.

In addition to the lack of evidence of apparent authority in the materials LiveLife cites, there is one more fatal issue with LiveLife's argument as to

apparent authority: LiveLife was not part of any of the communications it claims to have relied on in believing that Campbell had apparent authority to bind Bay Point. LiveLife's employee, David Rosenberg, admitted that Rommel was not LiveLife's agent during his deposition. *See* APP03690 ("Q. So does Ms. Rommel have any role with LiveLife? A. No. Q. Does Ms. Rommel have any role with Macoy Capital Partners? A. No).

For the foregoing reasons, the Court finds that no equitable mortgage was created during the LiveLife Loan Transaction.

**D. Equitable Subrogation**

Next, LiveLife argues that the Bankruptcy Court erred when it determined that LiveLife was not entitled to be equitably subrogated to the BofI loan and BofI Deed of Trust, and a likelihood of prejudice, rather than evidence of actual material prejudice must be shown to avoid the application of equitable subrogation. (ECF No. 10 at 4, 63-71). The parties do not dispute that LiveLife paid the BofI Note in the amount of $2,331,057.46, fully satisfied the BofI Deed of Trust, and that BofI filed a full release of its Deed of Trust on the Property. *See* APP02765-02769.

In the usual course, "when a senior deed of trust is satisfied, the junior lienholders remain in their respective order of priority and are consequently elevated up the priority line. Equitable subrogation interrupts this procedure and 'permits a person who pays off an encumbrance to assume the same priority position as the holder of the previous encumbrance.'" *Am. Sterling Bank v. Johnny Mgmt. LV, Inc.*, 126 Nev. 423, 245 P.3d 535, 539 (2010) (citations omitted).

Nevada recognizes the doctrine of equitable subrogation as formulated in Section 7.6 of the Third Restatement of Property: Mortgages. *See Houston v. Bank of Am.*, 119 Nev. 485, 78 P.3d 71, 74 (2003). The Nevada Supreme Court has held that the following standard applies: "[A] mortgagee will be subrogated when it pays the entire loan of another as long as the mortgagee 'was promised repayment and reasonably expected to receive a security interest in the real estate with the

priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of the intervening interests in the real estate.'" *Id.* (quoting Restatement (Third) of Property: Mortgages § 7.6(a)(4) (1997)). Negligence of the party seeking equitable subrogation is irrelevant. *See id.* fn.23.

After *Houston*, the Nevada Supreme Court clarified the standard for determining whether subrogation would materially prejudice holders of intervening interests in the real estate when the prejudice would result from an accelerated maturity date: "[I]n extreme situations, where the maturity date is drastically accelerated while the principal value and monthly payment obligations are significantly increased, an accelerated maturity date may be considered prejudicial as it directly affects the *likelihood* of default on a senior lien." *Johnny Management*, 245 P.3d at 540 (emphasis added). In *Johnny Management*, the Court analyzed whether the junior lienholder's assumption of risk of foreclosure on senior liens included a significant acceleration of the maturity date and concluded it did not because "the increased *risk* of default on the [senior] note prejudicially [sic] effects [the junior lienholder's] calculated risk of foreclosure on a senior lien." *Id.* at 541 (emphasis added).

Here there is no dispute that the LiveLife Note had a maturity date roughly 28 years sooner than the maturity date on the BofI Note and required a balloon payment of $3,176,223.75 within one year of the LiveLife Note's issue date. *Compare* APP03341 *with* APP06425-APP06432. Like the 14-year acceleration the Nevada Supreme Court deemed prejudicial in *Johnny Management*, here the 28-year acceleration would be prejudicial under the test articulated in *Johnny Management* because it "directly affects the likelihood of default on a senior lien" and the increased risk of default on the senior note prejudicially affects the junior lienholder's calculated risk of foreclosure on a senior lien. *See Johnny Management*, 245 P.3d at 540-41.

LiveLife's arguments all focus on whether or not there is evidence of material

1   prejudice to Bay Point and conclude no actual prejudice existed because "Bay

2   Point remained in exactly the same position it would have been in if the BofI lien

3   remained in place and no refinance had occurred" both because either "the sale

4   of the Property or Afflalo's bankruptcy would have triggered the due on sale clause

5   of the BofI mortgage, the Bay Point mortgage, or the LiveLife mortgage,

6   irrespective of the maturity date. . . ." (ECF No. 10 at 69 (citing APP02148-

7   APP02173; APP02179-APP02358; APP02440-76)). It is true that the *Houston*

8   court emphasized the lack of evidence of material prejudice in the record when

9   denying equitable subrogation. *See Houston*, 78 P.3d at 75. But the *Johnny*

10  *Management* court clarified that the test for prejudice focuses on the *likelihood* of

11  default at the time of the refinancing, rather than whether default *actually*

12  occurred contrary to the expectations of the junior lienholder sometime

13  thereafter. Therefore, this Court agrees with the Bankruptcy Court that equitable

14  subrogation is inappropriate here as a matter of law under the Nevada Supreme

15  Court's decision in *Johnny Management*.

16      **E. Trustee's Section 544(a) Claims**

17      Finally, LiveLife argues that the Bankruptcy Court erred in ruling that the 11

18  U.S.C. § 544(a) claim of the Bankruptcy Trustee was valid as a matter of law.

19  (ECF No. 10 at 4-5, 71-72). LiveLife maintains that the Recorded Subordination

20  Agreement satisfies all the requirements to create a valid mortgage lien against

21  the Property. Therefore, LiveLife argues, because the Recorded Subordination

22  Agreement was recorded, the trustee was on constructive notice of this lien,

23  which would defeat the trustee's claims under 11 U.S.C. § 544(a). (*See* ECF No.

24  10 at 62-63). The Trustee argues that even if an equitable lien could be

25  established in favor of LiveLife, § 544(a)(3) allows the trustee to take title to the

26  real property free and clear of any equitable liens. (*See* ECF No. 41).

27      As discussed above, however, the Recorded Subordination Agreement does not

28  independently create a lien because it specifically contemplates that the lien

31

would be created by the LiveLife Deed of Trust. Moreover, and as discussed above, the Recorded Subordination Agreement is invalid because no version was ever signed by Bay Point, LiveLife, and Afflalo, the Recorded Subordination Agreement is missing a page, and the version Bay Point did sign had different material terms—most importantly a different lender. The only version of the Subordination Agreement signed by Bay Point was never recorded, which renders it unenforceable under NRS 106.220. *See also Bank of Am., N.A. v. SFR Investments Pool One, LLC*, 134 Nev. 604, 427 P.3d 113, 119-120 (2018).

In addition, and as discussed above, the LiveLife Deed of Trust does not create or provide a valid security interest in the Property. The LiveLife Deed of Trust is only signed by AP, LLC, and there is no grant deed or quitclaim deed from Afflalo to AP, LLC. The LiveLife Deed of Trust cannot convey an interest in the Property because AP, LLC did not hold any title or ownership interest in the Property at the time of the transaction. Due to these deficiencies, the LiveLife Deed of Trust will not appear in the chain of title to the Property because the title holder was and continued to be Afflalo before and after the September 7, 2018 closing on the Property.

Ultimately, the Court need not reach the question of whether or not the Trustee's § 544 powers could prevail over an equitable lien or mortgage in favor of LiveLife because there is no such equitable lien here.

Further, equitable subrogation is inappropriate here for the same reasons as it is against Bay Point—the change in material terms increased the likelihood of default to the prejudice of the junior lienholders and, under *Johnny Management*, that is sufficient to foreclose equitable subrogation in this instance.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the

1    outcome of the appeal.

2        The Court further notes that, having undertaken a detailed review of the

3    record, no oral argument was required in this appeal.

4        It is therefore ordered that the Bankruptcy Court's Orders in Adversary

5    Proceeding No. 19-01084-ABL [ECF Nos. 361, 362, 363, 364] are affirmed.

6        The Clerk of Court is respectfully directed to enter judgment accordingly in

7    the instant appeal (2:21-cv-02106-ART) and close this case.

8

9

10       DATED THIS 1st day of May 2023.

11

12

13    _____

14    ANNE R. TRAUM
      UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28